# Illinois Official Reports

## Appellate Court

***Village of North Riverside v. Illinois Labor Relations Board, State Panel,***
2017 IL App (1st) 162251

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF NORTH RIVERSIDE, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, an Illinois Administrative Agency, JOHN J. HARTNETT, MICHAEL COLI, JOHN R. SAMOLIS, KEITH A. SNYDER, and ALBERT WASHINGTON, in Their Official Capacities, NORTH RIVERSIDE FIREFIGHTERS AND LIEUTENANTS UNION LOCAL 2714 INTERNATIONAL ASSOCIATION OF FIREFIGHTERS AFL-CIO, CLC, Respondents. |
| District & No. | First District, Third Division<br>Docket No. 1-16-2251 |
| Filed | September 29, 2017 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-CA-15-032. |
| Judgment | Affirmed. |
| Counsel on Appeal | Cary A. Horvath and George R. Robinson, of Odelson & Sterk Ltd., of Evergreen Park, for petitioner.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Sharon A. Purcell, Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board, State Panel, *et al.* |

J. Dale Berry and Elisa Redish, of Cornfield & Feldman LLP, of Chicago, for other respondent.

Panel          JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Cobbs and Justice Fitzgerald Smith concurred in the judgment and opinion.


**OPINION**

¶ 1    This appeal arises from a decision of the Illinois Labor Relations Board, State Panel (ILRB), which determined that the Village of North Riverside (Village) committed unfair labor practices against the North Riverside Firefighters and Lieutenants Union Local 2714 International Association of Firefighters AFL-CIO, CLC (Union). Specifically, the ILRB found that while the Union was pursuing interest arbitration, the Village improperly notified the Union that the parties' collective bargaining agreement (CBA) would be terminated.

¶ 2    On appeal, the Village contends that the ILRB's decision rests on a misinterpretation of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2014)). The Village argues that an employer's tender of termination notice under section 7 of the Act (5 ILCS 315/7 (West 2014)) negates any obligation for the employer to maintain the status quo through the conclusion of interest arbitration under section 14 (5 ILCS 315/14 (West 2014)). The Village also asserts that the notice tendered did not change employment terms during interest arbitration and challenges the ILRB's determination that the Village interfered with Union activities. We disagree and affirm the ILRB's decision.


¶ 3                                    I. Background

¶ 4    The Village and the Union were parties to a CBA set to expire on April 30, 2014. Section 24.2 of the CBA stated, "this Agreement shall remain in full force and effect after any expiration date while negotiations or resolution of impasse proceedings for a new or amended agreement, or any part thereof, are under way between the parties." In January and February 2014, shortly before the parties' contract was to expire, the Union made two demands to begin bargaining. Bargaining did not begin, however. In March 2014, the Union and the Village requested mediation. See 5 ILCS 315/14(j) (West 2014) (stating that "[a]rbitration procedures" are "initiated by *** requesting mediation as required under subsection (a) of this Section").

¶ 5    Meanwhile, the Village asked Paramedic Services of Illinois, Inc. (PSI) to submit a proposal for providing firefighting services. PSI already provided the Village with paramedic services. On June 18, 2014, the Village informed its residents by letter that the Village was seeking a proposal from PSI to provide fire protection services on the condition that PSI retain all current firefighters, "preserving their current base salaries, earned pension benefits and current health insurance, while allowing the Village to substantially reduce the adverse impact of future pension obligations imposed by the State." The letter stated that PSI would be "an excellent solution" to the Village's operating budget deficit of $1.9 million, $1.8 million of

which was "a direct result of the Village's growing public pension obligation, which [the Village has] not fully funded."[1] Although not stated in the letter, the Village anticipated that subcontracting with PSI would save the Village over $700,000 per year.

¶ 6    The Village finally began negotiating with the Union on June 24, 2014.[2] Following the first meeting, the Union's objective was to attempt to match the approximate $700,000 in savings that the Village would realize from privatizing services through PSI. The Union members also signed a declaration stating they would at no time accept employment with PSI. More meetings followed, and mediation eventually occurred. Proposals and counter-proposals were made. The Village disputed, however, that the Union's proposals would achieve the same savings as privatization through PSI and otherwise found the Union's proposals undeveloped or unfeasible.

¶ 7    At a meeting with the mediator on September 3, 2014, the Village proposed an 11-year contract providing that as Union members retired, they would be replaced by PSI employees. Within the week, the Union submitted (1) a reiterated prior offer, (2) a new offer dependent on privatization through a corporation yet to be formed by the Union, and (3) a new offer to form a regional fire protection agency, which depended on a Village referendum. According to the Village, the parties reached an impasse and completed mediation that day, September 9, 2014. Three days later, the Village filed an action in the circuit court (No. 14 CH 14774) seeking a declaration that the Village's financial circumstances permitted it to outsource its fire protection services, that neither the parties' expired CBA nor the Act prevented the decision to outsource, and that the decision was "based on a good faith legislative finding of economic necessity."

¶ 8    Less than a week later, the Union filed an unfair labor charge with the ILRB, arguing that the Village failed to bargain in good faith and interfered with Union members' protected activities. On September 19, 2014, the Union also filed a demand for compulsory interest arbitration with the ILRB. See 5 ILCS 315/14 (West 2014). The ILRB subsequently denied the Village's request to hold interest arbitration in abeyance until the court resolved the Village's declaratory judgment action.

¶ 9    Meanwhile, on October 6, 2014, the Village presented Union members with a letter and accompanying notice that are central to this dispute. The letter stated that the Village was "again offering full employment opportunity for the Firefighters and Lieutenants through PSI. As initially proposed, PSI will hire all members of the bargaining unit at their current base salary, provide the same health care, as well as beginning a 401k pension plan." The letter added that "although the enclosed Notice terminates all employment of the bargaining unit members pursuant to statute and the contract," the firefighters would remain in their positions until the court made a determination in the declaratory judgment action. Furthermore, the enclosed "notice of collective bargaining termination," purportedly issued pursuant to section 7 of the Act (5 ILCS 315/7 (West 2014)), informed the Union that the CBA "and all of its

---

[1]In October 2014, the Director of the Illinois Department of Insurance found the Village violated the Illinois Pension Code (40 ILCS 5/4-118 (West 2014)) by failing to annually levy a tax sufficient to satisfy the annual actuarial requirements of the pension fund. The director also found the Village's decision to underfund those pension funds constituted a conscious choice.

[2]The parties dispute whether the Union agreed to wait to begin negotiations until after the Village completed negotiations with the police union.

provisions" would terminate effective December 5, 2014. The Village added that it would meet with the Union to "confer and bargain concerning the impact of this termination."

¶ 10    In December, the ILRB issued a complaint for hearing, which recited the Union's allegation that the Village improperly issued termination notice and failed to maintain existing employment terms and conditions. In response, the Village argued that section 7 of the Act required the Village to issue the notice in question and, in any event, the Village had maintained employment terms and negotiated in good faith. On January 22, 2015, the parties proceeded to arbitration, but the arbitrator stayed those proceedings pending the circuit court's resolution of the declaratory judgment action. The court dismissed the Village's complaint with prejudice for lack of jurisdiction in October 2015, and the Village appealed. We recently affirmed that judgment. See *Village of North Riverside v. North Riverside Firefighters & Lieutenants Union Local 2714*, 2017 IL App (1st) 152900-U.

¶ 11    While that appeal was pending, a four-day evidentiary hearing on the ILRB complaint commenced before administrative law judge (ALJ) Anna Hamburg-Gal in December 2015. Three months later, she issued a recommended decision and order (RDO), finding that the Village violated sections 10(a)(1) and 10(a)(4) by engaging in surface bargaining regarding the Village's proposal to privatize fire services. 5 ILCS 315/10(a)(1), (a)(4) (West 2014). The ALJ also found the Village violated those subsections and section 14(*l*) by unilaterally altering terms and conditions of employment when it issued the notice of termination while interest arbitration was pending. *Id.*; 5 ILCS 315/14(*l*) (West 2014). The ALJ rejected the Village's contention that because all employees remained in their positions, the Village made no changes to employment conditions. Specifically, the Village notified the firefighters that the existing employment terms would terminate, notwithstanding that the Village chose to delay implementing the termination of employment until the court ruled. Furthermore, by offering to discuss the effects of the termination letter, the Village acknowledged that the letter constituted a change. Finally, the ALJ determined that the Village interfered with, restrained, or coerced Union members in their exercise of protected rights by issuing termination notice shortly after the Union requested compulsory interest arbitration, in violation of section 10(a)(1). The ALJ found the termination notice was issued, at least in part, because of the Union's decision to reject the Village's final offer and demand compulsory interest arbitration.

¶ 12    The ILRB affirmed the ALJ's decision, as modified. The ILRB rejected the ALJ's finding that the Village engaged in surface bargaining but agreed that the Village impermissibly changed terms and conditions of employment while interest arbitration was pending by issuing the notice of termination. The ILRB found that while section 7 of the Act generally set forth the mechanism for terminating CBAs, protective services employees were also governed by section 2 (5 ILCS 315/2 (West 2014)) and section 14 (5 ILCS 315/14 (West 2014)), which, respectively, set forth the policy of providing an alternative dispute resolution method for employees prohibited from striking and established interest arbitration. The ILRB stated that while it appreciated the Village's frustration at being required to go through interest arbitration, section 14 created no exception for a financial crisis. See also *Service Employees International Union, Local 73*, 33 PERI ¶ 49 (ILRB State Panel 2016) (finding that staggering financial challenges facing employers are no less staggering for having resulted from poor stewardship but section 14 presents no exception for an employer's critical financial hardship). The ILRB further concurred with the ALJ's determination that the Village interfered with protected rights in violation of section 10(a)(1) (5 ILCS 315/10(a)(1) (West 2014)) when it

issued termination notices. The Village now appeals. See *Foley v. American Federation of State, County, & Municipal Employees, Council 31, Local No. 2258*, 199 Ill. App. 3d 6, 10 (1990) (observing that final orders issued by the ILRB are appealed directly to the appellate court).

¶ 13                                        II. Analysis

¶ 14      On appeal, the Village first asserts that the ILRB erroneously determined that the Village violated sections 10(a)(1), 10(a)(4), and 14(*l*) of the Act by unilaterally changing terms and conditions of employment when it issued termination notice under section 7. The Village contends that issuing notice under section 7 cannot constitute an improper unilateral change within the meaning of the Act because the Act requires employers seeking termination of a CBA to tender such notice. Additionally, the Village argues that compliance with section 7's termination provisions excuses an employer from participating in interest arbitration under section 14 or maintaining the status quo to the conclusion of interest arbitration.

¶ 15      Before determining whether the ILRB properly found the Village violated the Act, we must first determine what the provisions of the Act require, a matter of statutory construction. See *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 473 (2005). We review the ILRB's construction of the relevant statutes *de novo*.[3] *Id.*

¶ 16                               A. Statutory Construction

¶ 17      The cardinal rule of statutory interpretation is to effectuate the legislature's intent, giving language its plain and ordinary meaning. *In re Marriage of Dougherty*, 2017 IL App (1st) 161893, ¶ 7. Unambiguous language must be applied as written without regard to other rules of statutory interpretation. *Moore v. Green*, 219 Ill. 2d 470, 479 (2006). That being said, courts must consider all provisions of a statutory enactment together, rather than construing phrases in isolation. *Stern v. Wheaton-Warrenville Community Unit School District 200*, 233 Ill. 2d 396, 410 (2009). Furthermore, courts defer to an agency's construction of an ambiguous statute (*City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 516 (1990)), as the agency's decisions are informed by its expertise and experience (*State Department of Central Management Services (Department of Corrections) v. State Labor Relations Board, State Panel*, 373 Ill. App. 3d 242, 249 (2007)).

¶ 18                              B. The Procedures of the Act

¶ 19      The ILRB is charged with administering and enforcing the Act (*City of Freeport*, 135 Ill. 2d at 507), the purpose of which is to regulate labor relations in the public sector and resolve disputes under CBAs (5 ILCS 315/2 (West 2014)). See also *Board of Education of Springfield Public Schools, District No. 186 v. Springfield Education Ass'n*, 47 Ill. App. 3d 193, 197 (1977) (stating that a labor dispute exists where neither the union nor the employer have accepted or compromised on demands impacting wages and conditions of employment). The Act defines collective bargaining as "bargaining over terms and conditions of employment,

---

[3]The standard of review depends on whether an issue is one of fact, is one of law, or presents a mixed question of law and fact, notwithstanding our supreme court's acknowledgement that it has not always presented clear distinctions between these types of issues. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210-11 (2008).

including hours, wages, and other conditions of employment, as detailed in Section 7 and which are not excluded by Section 4." 5 ILCS 315/3(b) (West 2014). Section 7 similarly requires a public employer and union representative to negotiate in good faith over wages, hours and employment terms (5 ILCS 315/7 (West 2014)), while section 4 generally excuses employers from bargaining over inherent managerial policy (5 ILCS 315/4 (West 2014)). We note that the Village does not dispute on appeal that privatization would constitute a mandatory subject of bargaining had the Village not tendered termination notice under section 7.[4]

¶ 20 In a typical negotiation where the parties have reached an impasse, the employer can unilaterally implement its final offer, and employees can strike. *State Department of Central Management Services (Department of Corrections)*, 373 Ill. App. 3d at 249, 253; see also *Skokie Firefighters Union, Local 3033 v. Illinois Labor Relations Board, State Panel*, 2016 IL App (1st) 152478, ¶ 18 (stating that parties reach an impasse when neither is willing to depart from their respective positions). A community would be presented with a danger to its health and safety, however, if the functions of certain " '[e]ssential services employees' " were to terminate. 5 ILCS 315/3 (West 2014). Firefighters provide such indispensable services. *Board of Education of Peoria School District No. 150 v. Peoria Federation of Support Staff, Security/Policemen's Benevolent & Protective Ass'n Unit No. 114*, 2012 IL App (4th) 110875, ¶ 16, *aff'd*, 2013 IL 114853. Consequently, they are statutorily prohibited from striking. 5 ILCS 315/14(*l*), (m) (West 2014).

¶ 21 That being said, depriving firefighters of the right to strike disadvantages them in bargaining with their employers. *Board of Education of Peoria School District No. 150*, 2012 IL App (4th) 110875, ¶ 16. Employees who lack the statutory right to strike "would not be on equal footing with the employer were the employer to implement its final offer upon reaching impasse." *State Department of Central Management Services (Department of Corrections)*, 373 Ill. App. 3d at 249, 253. Consequently, the legislature attempted to correct this imbalance by affording those employees bargaining power to approximate the right to strike. *Board of Education of Peoria School District No. 150*, 2012 IL App (4th) 110875, ¶ 16.

¶ 22 Section 2 of the Act states that "[t]o prevent labor strife and to protect the public health and safety of the citizens of Illinois, all collective bargaining disputes involving persons designated by the Board as performing essential services *** shall be submitted to impartial arbitrators, who shall be authorized to issue awards in order to resolve such disputes." 5 ILCS 315/2 (West 2014). Where an employee's right to strike is prohibited by law, an "alternate, expeditious, equitable and effective procedure" is required to resolve labor disputes. *Id.* In addition, the

---

[4]Deciding whether a decision involves a mandatory subject of bargaining requires determining (1) whether the matter involves wages, hours, employment terms and conditions and, if so, (2) whether the matter also involves inherent managerial authority. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205-06 (1998). If both inquiries are answered affirmatively, the benefits of bargaining must be weighed against the burdens on the employer's authority. *Id.* at 206; see also *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board*, 153 Ill. App. 3d 744, 752-53 (1987) (finding that the Act requires employers and their employees' representatives to bargain collectively about contracting out work that the employees of an existing bargaining unit previously performed); *Service Employees International Union, Local 73*, 33 PERI ¶ 49 (finding the dissolution of a fire department constituted a mandatory subject of bargaining and the employer was not entitled to implement its decision before the completion of interest arbitration under section 14).

provisions for such awards must be liberally construed to satisfy that requirement. *Id.* Thus, the legislature has empowered firefighters through interest arbitration (*Board of Education of Peoria School District No. 150*, 2012 IL App (4th) 110875, ¶ 16), which is found in section 14 of the Act.

¶ 23    Section 14, titled "Security Employee, Peace Officer and Fire Fighter Disputes," provides that the comprehensive procedure set forth therein begins with mediation. 5 ILCS 315/14(a) (West 2014). Generally, if a dispute has not been resolved within 15 days of the parties' first meeting with the mediator, either party may request arbitration (*id.*), in which case the parties must proceed to arbitration (5 ILCS 315/14(b), (c), (d) (West 2014)). Thus, section 14 gives firefighters prohibited from striking a procedure to "engage in negotiation and mediation, and, if no compromise can be reached, to *compel* arbitration." (Emphasis added.) *Skokie Firefighters Union, Local 3033*, 2016 IL App (1st) 152478, ¶ 3. This right, reserved for employees prohibited from striking, reflects an economic *quid pro quo. Board of Education of Peoria School District No. 150*, 2012 IL App (4th) 110875, ¶ 16. Of particular relevance here, section 14(*l*) states that "[d]uring the pendency of proceedings before the arbitration panel, existing wages, hours, and other conditions of employment shall not be changed by action of either party without the consent of the other." 5 ILCS 315/14(*l*) (West 2014). An employer's unilateral change to employment conditions and terms constitutes an unfair labor practice because such unilateral actions deprive employees of their right to bargain. *Board of Education of Sesser-Valier Community Unit School District No. 196 v. Illinois Educational Labor Relations Board*, 250 Ill. App. 3d 878, 882 (1993). Furthermore, "[g]ood faith bargaining, within the meaning of the Act, does not end at impasse; it continues through interest arbitration and the ultimate issuance of an award." *American Federation of State, County & Municipal Employees, Council 31*, 22 PERI ¶ 10 (ILRB State Panel 2005).

¶ 24    The Village nonetheless asserts that an employer's tender of termination notice under section 7 negates the requirements of section 14, so long as section 7's termination prerequisites have been satisfied. Section 7 states, in pertinent part, as follows:

"The duty 'to bargain collectively' shall also mean that no party to a collective bargaining contract shall terminate or modify such contract, unless the party desiring such termination or modification:

(1) serves a written notice upon the other party to the contract of the proposed termination or modification 60 days prior to the expiration date thereof, or in the event such contract contains no expiration date, 60 days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Board within 30 days after such notice of the existence of a dispute, provided no agreement has been reached by that time; and

(4) *continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of 60 days after such notice is given to the other party or until the expiration date of such contract, whichever occurs later.*" (Emphasis added.) 5 ILCS 315/7 (West 2014).

While both section 7 and section 14(*l*) require an employer to maintain the status quo, section 14(*l*) imposes a duty to maintain the status quo through the conclusion of interest arbitration, which will generally be longer than the period called for under section 7.[5]

¶ 25    Having considered the statutory scheme in place, we find the plain language of section 7 does not authorize an employer such as the Village to unilaterally terminate a CBA while interest arbitration with essential services employees is pending. First, section 7's termination provision does not confer a right upon an employer; rather, it imposes several duties. In addition, that provision purports to define what the duty to engage in collective bargaining "shall *also* mean" (emphasis added) (*id.*), demonstrating that other provisions of the Act may impose additional, more stringent duties. While section 7 prevents a party from terminating a CBA unless its requirements are satisfied, that statute does not state that satisfying its requirements will in all instances permit an employer to terminate a CBA. The language of section 7 does not support the Village's contention that "[a] public employer's obligation to maintain the status quo under Section 14(l) is extinguished once a public employer properly acts under Section 7." The same is true of the ILRB's rule governing notice under section 7 as it applies to employees statutorily prohibited from striking. 80 Ill. Adm. Code 1230.50 (2003). Similarly, section 14(*l*)'s requirement that parties maintain the status quo through the conclusion of interest arbitration does not expressly create an exception for an employer who has tendered notice of a proposed termination. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 15 (stating that courts may not read unexpressed limitations into an unambiguous statute); see also *Skokie Firefighters Union, Local 3033*, 2016 IL App (1st) 152478, ¶ 18 (stating that sections 7 and 14 of the Act contemplate that arbitration be used to resolve impasses).[6]

¶ 26    Even assuming that the plain language of section 7 could be read to grant employers an unfettered right to terminate CBAs, we would reach the same result. A general statute with inclusive language will not apply to a matter specifically addressed in a different provision of the same enactment. *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 31. This canon of construction most frequently applies where a statute granting a general permission or prohibition is contradicted by a statute containing a specific permission or prohibition. *Id.* Because section 14 specifically grants employees prohibited from striking the right to pursue interest arbitration, that section would control over a statute generally granting employers the right to terminate CBAs and forgo interest arbitration.

¶ 27    Section 2 also compels this determination. It expressly states that disputes involving such employees prohibited from striking "shall be submitted to impartial arbitrators," as an "alternate, expeditious, equitable and effective procedure" to resolve disputes. 5 ILCS 315/2 (West 2014). Allowing employers to terminate a CBA and refuse to proceed to interest arbitration with firefighters would contradict the letter and spirit of the Act. No *quid pro quo*

---

[5]Section 7's prohibition on strikes and lockouts, while not meaningless, will generally have no practical effect on parties already prohibited from engaging in such conduct.

[6]We categorically reject the Village's assertion section "14(*l*) only identifies a point in time when the obligation is triggered and includes no definite point when this obligation ends." Section 14(*l*) states that the employer must maintain the status quo "[d]uring the pendency of proceedings before the arbitration panel," thereby identifying both the beginning and the end of the employer's obligation. 5 ILCS 315/14(*l*) (West 2014).

would be achieved, and employers would hold power greatly disproportionate to that held by the firefighters. See *American Federation of State, County & Municipal Employees*, 22 PERI ¶ 10 (if employers were allowed to implement their final offer while employees were denied the right to strike, section 14 employees would have fewer rights than employees entitled to strike, and the balance of power would impermissibly shift toward the employers). As the ILRB observes, employers would essentially have discretion to decide whether arbitration could proceed. If an employer preferred that it not, the employer need only tender notice of termination. Although the Village argues that section 2 does not state that a "public employer's choice to forgo dispute resolution procedures and implement Section 7 notice and termination procedures constitutes an unfair labor practice," the Village has failed to show that employers have that choice in the first instance.

¶ 28 Impartial arbitrators are well equipped to resolve collective bargaining disputes. Section 14(h) states that where the parties have begun negotiations looking toward a new or amended agreement and the parties dispute employment conditions, the arbitration panel must consider factors including the employer's lawful authority, the "interests and welfare of the public and the financial ability of the unit of government to meet those costs." 5 ILCS 315/14(h)(3) (West 2014). Additionally, an arbitrator can consider an employer's financial ability to satisfy its pension obligations. *International Ass'n of Firefighters Local 49 v. City of Bloomington*, 2016 IL App (4th) 150573, ¶ 30. Thus, arbitrators are directed to consider factors relevant to privatizing fire services.

¶ 29 The Village correctly observes that section 14(h) refers to the parties looking toward a new or amended agreement but does not refer to the parties negotiating toward a complete severance of any contractual relationship. Contrary to the Village's suggestion, however, this omission does not prohibit an arbitration award terminating a CBA. Instead, it merely reflects that Unions generally bargain toward preserving their statutory and contractual power and section 10(a)(4) requires employers "to bargain collectively in good faith," which cannot be fulfilled if an employer will consider nothing less than termination. 5 ILCS 315/10(a)(4) (West 2014). Furthermore, the termination provision of section 7 itself requires that employers proposing termination offer "to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications." 5 ILCS 315/7 (West 2014). While the goal of arbitration is to reach an agreement, section 14(h) does not prevent an interest arbitrator from determining that the circumstances presented justify an award permitting an employer to sever any contractual relationship with the Union.

¶ 30 Similarly, section 14(i) does not prevent an arbitrator from finding termination is appropriate. 5 ILCS 315/14(i) (West 2014). That statute states that "[i]n the case of fire fighter *** matters, the arbitration decision shall be limited to wages, hours, and conditions of employment." *Id.* To state the obvious, the very existence of employment is perhaps the most significant condition of employment. Thus, the categorical elimination of employment, a CBA and every condition thereof, falls within the purview of the arbitrator's decision.

¶ 31 We further reject the Village's assertion that the ILRB's decision constitutes improper legislation because it grants essential services employees a special privilege denied to the majority of public employees. First, the Village has forfeited this contention by failing to raise it before the administrative agency. *Crowley v. Board of Education of the City of Chicago*, 2014 IL App (1st) 130727, ¶ 35; *cf. Church v. State*, 164 Ill. 2d 153, 164 (1995) (rejecting the contention that the plaintiff forfeited his constitutional argument in the circuit court where his

pleading filed in that court adequately raised the issue). More importantly, the Village's contention is without merit.

¶ 32 "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. This provision is intended to prevent arbitrary classifications that favor a select group without a reasonable basis for doing so. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 18. Stated differently, the constitution only prohibits special legislation when a general law would equally suffice. *Id.* ¶ 22. "If an entity is uniquely situated, the special legislation clause will not bar the legislature from enacting a law tailored specifically to address the conditions of that particular entity." (Emphasis omitted.) *Id.* Thus, courts must determine (1) whether the statutory classification discriminates in favor of one group and, if so, (2) whether the classification is arbitrary. *Id.* ¶ 23.

¶ 33 Here, section 14 favors essential services employees, including firefighters, to the exclusion of other public employees. This classification is far from arbitrary, however. Section 14 ensures that firefighters have the ability to bargain with employers. Other employees who possess the right to strike already have bargaining power and, thus, do not require additional economic weapons.

¶ 34 We also reject the Village's contention that requiring it to submit to interest arbitration before terminating its relationship with the Union violates Illinois public policy favoring the freedom to contract. See *Jespersen v. Minnesota Mining & Manufacturing Co.*, 183 Ill. 2d 290, 295 (1998) (finding that perpetual contracts are disfavored); *Hussein v. L.A. Fitness International, L.L.C.*, 2013 IL App (1st) 121426, ¶ 11 (observing that public policy in Illinois strongly favors parties' freedom to contract). The Village has failed to cite any authority supporting its suggestion that this policy may never be outweighed by more important considerations. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Additionally, it is well settled that CBAs are not ordinary contracts. See *Thompson v. Policemen's Benevolent Labor Committee*, 2012 IL App (3d) 110926, ¶ 12; see also *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550-51 (1964) ("While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract."). In any event, the Act does not create a perpetual contract. Instead, it merely prevents an employer from unilaterally terminating its contractual relationship without an independent party determining that the factors involved, including the public's welfare and the government's financial position (5 ILCS 315/14(h) (West 2014)), justify that decision. Furthermore, section 24.2 of the parties' CBA defines when the CBA ends. Specifically, the parties' contractual relationship ends, or is replaced with a new contractual relationship, when "negotiations or resolution of impasse proceedings" are concluded. We are not persuaded by the Village's position.

¶ 35                    C. The Village's Unilateral Change

¶ 36 Having established what the Act requires, we now determine whether the ILRB properly determined that the Village's conduct in this instance violated the Act. Examining the legal effect of given facts presents a mixed question of law and fact. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). A decision examining that effect will not be modified unless clearly erroneous. *Id.* Accordingly, we will not alter the

ILRB's decision unless it was clearly erroneous, which occurs only where the reviewing court holds the definite conviction that a mistake has been made. *Board of Education of the City of Chicago v. Illinois Educational Labor Relations Board*, 2015 IL 118043, ¶ 16. We find no mistake was made in this instance.

¶ 37 Pursuant to section 10(a)(4), an employer at impasse cannot make unilateral changes to the conditions and terms of employment. *International Ass'n of Fire Fighters, Local 95*, 25 PERI ¶ 169 (ILRB State Panel 2009). Additionally, section 14(*l*) extends this prohibition to the conclusion of the requisite impasse procedures for firefighters set forth in section 14. *Id.*; 5 ILCS 315/14(*l*) (West 2014)) (stating that "existing *** conditions of employment shall not be changed by action of either party without the consent of the other"). To alter terms and conditions of employment during that period violates section 10(a)(4). *International Ass'n of Fire Fighters, Local 95*, 25 PERI ¶ 169.

¶ 38 First, we reject the Village's contention that it did not issue the October 6, 2014, letter and accompanying notice "[d]uring the pendency of proceedings before the arbitration panel" and, thus, did not violate the Act. See 5 ILCS 315/14(*l*) (West 2014). Section 14(*l*) states that "proceedings are deemed to be pending before the arbitration panel upon the initiation of arbitration procedures under this Act." *Id.* In turn, "[a]rbitration procedures" are initiated by "requesting mediation as required under subsection (a) of this Section." See 5 ILCS 315/14(j) (West 2014). Consequently, arbitration procedures began and proceedings were pending before the arbitration panel when the parties submitted a request for mediation in March 2014, well before the Village issued notice that it was terminating the CBA. *International Ass'n of Firefighters, Local 23*, 30 PERI ¶ 67 (ILRB State Panel 2013). Once again, the Village's argument results from an isolated reading of one provision within a comprehensive act.

¶ 39 Here, the Village purported to issue a letter and notice pursuant to section 7. That section contemplates notice of a "*proposed* termination." (Emphasis added.) 5 ILCS 315/7 (West 2014). Yet, the Village's letter unequivocally stated that the accompanying notice "terminates all employment of the bargaining unit members pursuant to statute and the contract," indicating that the employment terms recited in the CBA would no longer be honored. In addition, the notice identified December 5, 2014, as the effective termination date. Although the Village's letter apparently volunteered that the Union members would remain in their positions until the circuit court ruled on the declaratory judgment action, the letter did not acknowledge any legal duty to do so. Knowing that one serves solely at the pleasure of his master hardly provides the job security contemplated by the Act and the parties' CBA, both of which required the Village to leave the employees' positions, the CBA and all bargained-for terms intact. Furthermore, the Village stated that the employees would remain in their positions but did not state that it would continue to adhere to the terms of the CBA.

¶ 40 The Village's offer to meet with the Union to discuss the impact of this *fait accompli* also showed that the Village knew it had effectuated a change, notwithstanding that the Village argues it was merely complying with section 7's requirement that a party desiring termination "offer[ ] to meet and confer with the other party for *the purpose of negotiating a new contract or a contract containing the proposed modifications*" (emphasis added) (5 ILCS 315/7 (West 2014)). See also *Wapella Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 168 (1998) (suggesting that a change occurs when an employer unambiguously announces a change in policy, not when the policy change is implemented, "since the claimed unfair labor practice is the unilateral change in policy not its application to

particular individuals *per se*"). The Village offered "to confer and bargain concerning *the impact of this termination*," not for the purpose of negotiating a new contract or proposed modification. We find the Village's contention to be disingenuous.

¶ 41　　Here, the Village issued notice of termination, not notice of a proposed termination pursuant to section 7. By doing so, the Village unilaterally altered the terms of employment.[7]

¶ 42　　　　　　　　　　　　D. Interference With Union Activities

¶ 43　　Finally, the Village asserts that the ILRB improperly determined that the Village interfered with employees in the exercise of their protected rights when the Village issued the termination notice following the Union's demand for interest arbitration because the record does not show the Village acted from an improper motivation.

¶ 44　　Section 10(a)(1) states, in pertinent part, that "[i]t shall be an unfair labor practice for an employer or its agents *** to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act." 5 ILCS 315/10(a)(1) (West 2014). Employees can establish a *prima facie* violation of section 10(a)(1) by showing that (1) they were engaged in statutorily protected activity, (2) their employer knew of the nature of such conduct, and (3) their employer acted against them for discriminatory reasons, "*i.e.*, animus toward [their] participation in such activities." *Pace Suburban Bus Division of the Regional Transportation Authority v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 484, 494-95 (2010). With respect to the last requirement, a party may alternatively show that the employee's exercise of protected conduct was a motivating or substantial factor leading to the adverse action. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989); see also *Pace Suburban Bus Division of the Regional Transportation Authority*, 406 Ill. App. 3d at 496 (stating that "[r]equiring the employee to also prove [under section 10(1)] that her employer's actions were motivated by animus toward the union would unduly burden an employee seeking redress against an employer interfering with those rights"). Because motive presents a factual question, the ILRB can infer discriminatory motive from direct or circumstantial evidence. *City of Burbank*, 128 Ill. 2d at 345. The ILRB's finding in this regard must be accepted if supported by substantial evidence. *Id.* Once a *prima facie* case is made, the employer has the burden of advancing a legitimate reason for its conduct. *County of Cook v. Illinois Labor Relations Board, Local Panel*, 2012 IL App (1st) 111514, ¶ 25.

¶ 45　　We reject the Village's contention that the Union's evidence did not support the conclusion that the termination letter and notice were motivated by animus against the Union or resulted from the Union's exercise of protected conduct. We find the record supports the ILRB's determination that the Village sent termination notice, at least in part, because the Union exercised its statutory right to interest arbitration.

¶ 46　　According to the Village, the parties reached an impasse on September 9, 2014. Three days later, the Village filed its circuit court complaint seeking a declaration that (1) the Village's financial circumstances permitted it to outsource its fire protection services, (2) neither the parties' expired CBA nor the Act prevented the decision to outsource, and (3) the decision was "based on a good faith legislative finding of economic necessity." Yet the Village did not at that time tender its termination notice.

_____

[7]We also observe that the notice was tendered well after the CBA's expiration date, not 60 days before. See 5 ILCS 315/7 (West 2014).

¶ 47    On September 19, 2014, the Union filed a demand for compulsory interest arbitration with the ILRB, thereby exercising rights protected by the Act. Two weeks later, the Village tendered termination notice, only after the Union sought arbitration. The Village essentially shifted from seeking a declaration that the Village had the right to terminate the CBA to making the same declaration itself. Nothing pertinent had happened in the interim. We find substantial circumstantial evidence supports the ILRB's finding that the Village was motivated to tender termination notice at least partly by the Union's protected activity. The Village's concern with preserving its so-called authority to terminate the CBA was not significant enough for it to tender notice before the Union sought interest arbitration. To the extent the Village argues that it acted for the legitimate purpose of complying with section 7, we reiterate that the notice tendered did more than satisfy section 7. That statute requires employers to propose termination, not declare it. Accordingly, we affirm the ILRB's decision.

¶ 48                              III. CONCLUSION

¶ 49    Section 7 of the Act does not grant public employers the right to unilaterally terminate a CBA with employees prohibited from striking. Such a right would destroy the balance of power carefully constructed by the Act. By tendering the Union unequivocal notice that the CBA and, consequently, all bargained-for terms would terminate, the Village unilaterally changed terms of employment while interest arbitration was pending. Furthermore, the record supports the ILRB's determination that the Village issued that notice because the Union exercised its right to interest arbitration.

¶ 50    For the foregoing reasons, we affirm the judgment of the ILRB.

¶ 51    Affirmed.