2022 IL App (1st) 220346-U

SIXTH DIVISION
November 4, 2022

No. 1-22-0346

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7; JOHN CATANZARA JR.; POLICEMEN'S BENEVOLENT & PROTECTIVE ASS'N OF ILLINOIS, UNITS 156 A, B, C—SERGEANTS, LIEUTENANTS, CAPTAINS; JAMES CALVINO; MICHAEL STISCAK; and KEVIN CHAMBERS, | ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 21 CH 05276 |
| THE CITY OF CHICAGO; THE CHICAGO POLICE DEPARTMENT; LORI LIGHTFOOT, In Her Official Capacity as Mayor of the City of Chicago; and DAVID BROWN, In His Official Capacity as Superintendent of Police, | ) ) ) ) ) ) ) ) | The Honorable Raymond W. Mitchell, Judge Presiding. |
| Defendants-Appellees. | ) ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the unions failed to identify a violation of a well-defined and dominant public policy requiring the invalidation of an arbitration award in the City' favor, the circuit court's denial of their motion to vacate that award is affirmed.

¶ 2    This case stems from the City of Chicago (City)'s implementation of a policy, announced

on August 25, 2021, requiring city employees to be vaccinated against COVID-19. This policy extended to the sworn police officers who are members of the plaintiff labor organizations. The parties involved were all subject to collective bargaining agreements (CBAs), and the plaintiffs filed grievances before an arbitrator after the City refused to bargain to agreement or impasse about the terms and effects of the City's vaccination policy. The arbitrator found that the City was authorized to unilaterally implement the policy under a management rights clause included in each of the CBAs, and the circuit court denied the plaintiffs' motion to vacate that arbitration award on the basis that it was against public policy. On appeal, the plaintiffs argue they have identified several well-defined and dominant public policies that require us to overturn the arbitrator's award. For the following reasons, we disagree, and affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4                         A. The Collective Bargaining Agreements

¶ 5     The plaintiffs in this case are the Fraternal Order of Police Lodge No. 7 (FOP)—a labor organization and "the exclusive collective bargaining representative of all sworn personnel below the rank of sergeant employed by the Chicago Police Department"; John Catanzara Jr.—the president, principal executive officer, and a member of FOP; Policemen's Benevolent and Protective Association of Illinois, Units 156A (Sergeants), 156B (Lieutenants), and 156C (Captains) (collectively, the PBPA)—a labor organization and "the exclusive collective bargaining representative of all sworn personnel who hold the rank of Sergeant, Lieutenant, or Captain"; James Calvino—the president, principal executive officer, and a member of PBPA Unit 156A; Michael Stiscak—the president, principal executive officer, and a member of PBPA Unit 156B; and Kevin Chambers—the president, principal executive officer, and a member of PBPA Unit 156C. We will refer to the plaintiffs collectively as the Unions.

¶ 6    FOP and the City were parties to a CBA effective from July 1, 2012, to June 30, 2017. Negotiations for a successor CBA began in October 2017 and the parties were still negotiating at the time the Unions filed their grievances on October 14, November 8, and November 16, 2021. Under section 28.2 of the CBA between FOP and the City, the CBA remains in effect during negotiations until the parties reach a new agreement. The three PBPA units each have CBAs with the City, all of which were effective July 1, 2016, and set to expire on June 30, 2022.

¶ 7    The parties' arguments center on a few specific portions of these agreements. The provisions relevant to this appeal are substantially similar in each document, and to avoid repetition we will quote only from FOP's CBA.

¶ 8    Article 4 of each of the CBAs is titled "Management Rights." In the FOP CBA, article 4 provides:

> "The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. The rights reserved to the sole discretion of the Employer shall include, but not be limited to, rights:
>
> * * *
>
> N. to add, delete or alter policies, procedures, rules and regulations.
>
> Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this Agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this Agreement."

¶ 9    Article 28 of each CBA is titled "Duration, Enforcement and Dispute Resolution," and section 28.3 of that article is titled "Impasse Resolution, Ratification and Enactment." In the FOP

CBA, section 28.3 provides:

"B. If complete agreement is not reached between the parties as to the items for negotiation at the end of any negotiating period, the following procedure shall apply:

1. In the event that disputed terms cannot be resolved during the negotiation period, all disputed items shall be referred to a three person Arbitration Board, one member to be selected by each of the parties and the third member to be jointly agreed upon by the parties.

\* \* \*

11. As permitted by 5 ILCS 315/14(p), the impasse resolution procedure set forth herein above shall govern in lieu of the statutory impasse resolution procedure provided under 5 ILCS 315/14, except that the following portions of 315/14 shall nevertheless apply; Subsections (h), (i), (k) and (m)."

¶ 10                    B. The City's COVID-19 Vaccination Policy

¶ 11    COVID-19 "is an infectious disease caused by the SARS-CoV-2 virus" that spreads "from an infected person's mouth or nose in small liquid particles when they cough, sneeze speak sing or breathe." <u>Coronavirus    disease    (COVID-19)</u>, World    Health    Organization, who.int/health-topics/coronavirus (last visited Oct. 27, 2022). On August 25, 2021, the City announced its intention to implement a policy that would require COVID-19 vaccinations for all City employees, contractors, and vendors as of October 15, 2021. The City submitted the proposed vaccination policy to the Unions for discussion, and negotiations over the policy were conducted between the City and the Unions in August, September, and early October. According to the Unions, at a meeting held on October 7, 2021, they responded to the City's proposed vaccination policy, and the City indicated it would review the Unions' responses.

¶ 12    On the following day, October 8, 2021, the City sent an email to all its employees stating that they "must be fully vaccinated against COVID-19 by October 15 unless they ha[d] received a medical or religious accommodation." The email also included a copy of the official vaccination policy (the Vaccination Policy).

¶ 13    According to the Unions, the Vaccination Policy unilaterally imposed certain conditions of employment that the parties had not negotiated for, including a requirement that employees report their vaccination status to the City by or before October 15, 2021, a requirement that employees either be fully vaccinated against COVID-19 by October 15 or test twice per week, removal of the testing option for employees who did not receive an approved exemption (and a requirement that those employees be fully vaccinated by December 31, 2021), and a requirement that non-exempted employees who were not fully vaccinated by December 31 be placed on non-disciplinary, no-pay status until they became vaccinated.

¶ 14                    C. The Unions' Grievance Proceedings

¶ 15    On October 14, 2021, the PBPA units each filed a grievance asserting that the City had violated section 28.3 of the governing CBAs and taking issue with the "City's unilateral implementation of its COVID-19 policy" and its refusal to participate in expedited interest arbitration.

¶ 16    In its grievances, filed on October 14, 2021, the Lodge also asserted that the City "unilaterally implemented a COVID-19 vaccination and testing policy in violation of sections 28.2 & 28.3 of the [CBA]." FOP complained that the City impermissibly refused to engage in interest arbitration "per the requirements of the impasse resolution procedure set forth in [ ]section 28.3 of the CBA." FOP also stated that the Vaccination Policy "change[d] existing and adds new terms and conditions of employment for all members of FOP's bargaining unit." FOP filed an additional

grievance on November 8, 2021, arguing that the Vaccination Policy violated article 8 of its CBA, which stated that no officer could be "suspended, relieved from duty or otherwise disciplined in any manner without just cause," and another on November 16, 2021, on behalf of "all officers who were relieved of pay and benefits as a result of the Department's unilateral implementation of a "Vaccine Portal," which they argued were actions "taken without just cause."

¶ 17    The Unions also filed a complaint for a temporary restraining order (TRO) against the City in the circuit court. In the circuit court case, the Unions sought to prevent the City from implementing its Vaccination Policy pending completion of the grievance arbitration process. On November 1, 2021, the circuit court stayed enforcement of the December 31, 2021, vaccination deadline until arbitration on the Unions' grievances was completed. The City filed a petition under Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017), asking this court to reverse the circuit court's TRO order. That petition was denied on November 9, 2021 (case No. 1-21-1426).

¶ 18    The parties proceeded to an arbitration that addressed all the grievances filed by the Unions. There was a four-day hearing on the grievances held on December 29 and 30, 2021, and January 3 and 4, 2022. On February 23, 2022, the arbitrator denied the Unions' grievances in a comprehensive 54-page written opinion and award. The arbitrator concluded that implementation of the Vaccination Policy was an exercise of the City's contractually recognized management rights established in article 4(N) of the CBAs. In doing so, the arbitrator rejected the Unions' argument that the parties' disputes about the Vaccination Policy should be resolved pursuant to the impasse arbitration provisions in section 28.3 of the CBAs. The arbitrator stated that management rights have been interpreted by arbitrators as permitting the City "to promulgate limited duty policies which in the broadest sense is related to the Department determining whether an Officer, health-wise, can perform required duties." The arbitrator concluded that "the

Department pursuant to Article 4, Management Rights, along with the City, had the right to issue the vaccine mandate and that in doing so the Department's action was a reasonable exercise of management rights."

¶ 19                                    D. Post-Arbitration Proceedings

¶ 20    On February 24, 2022, the Unions moved to vacate the arbitration award in the circuit court pursuant to the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2020)). The Unions asked that the arbitration award be vacated "on the ground that it constitute[d] a violation of one or more explicit, clearly defined, and dominant public policies of the State of Illinois." On March 3, 2022, the City filed a motion to dismiss.

¶ 21    On March 10, 2022, the circuit court denied the Unions' motion to vacate the arbitration award, without ruling on the City's motion to dismiss. The Unions filed an emergency motion asking the court for language pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was "no just reason for delaying the appeal of the denial" of the motion to vacate. The Unions also filed an emergency motion to stay the court's order or extend the TRO pending appeal.

¶ 22    The circuit court immediately granted the Unions' motion for a Rule 304(a) finding. The court denied the motion to stay the order or to extend the TRO.

¶ 23                                    II. JURISDICTION

¶ 24    The Unions timely filed their notice of appeal on March 11, 2022. We have jurisdiction pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from final judgments as to one or more but fewer than all the parties' claims.

¶ 25    In its brief, the City argues that, because the unions are seeking to invalidate this arbitration agreement based on public policies that are set out in the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2020)), any claims by the Unions are under the exclusive jurisdiction

of the Illinois Labor Relations Board (Labor Board). However, as we have long recognized, "the [Act] does not provide for exclusive jurisdiction in the [Labor Board] over arbitration awards, and the decisions of the Illinois Supreme Court and this and other appellate courts have held that the circuit court has jurisdiction over public policy challenges to such awards." *Department of Central Management Services v. American Federation of State, County & Municipal Employees (AFSCME)*, 222 Ill. App. 3d 678, 682 (1991). The cases relied upon by the City do not suggest otherwise and did not involve review of an arbitration award. *Gantz v. McHenry County Sheriff's Department Merit Commission*, 296 Ill. App. 3d 335, 339-40 (1998); *Foley v. AFSCME, Council 31, Local No. 2258*, 199 Ill. App. 3d 6, 11 (1990). The fact that the public policies the Unions rely on are found in the Act does not change the analysis or deprive this court of jurisdiction.

¶ 26                                III. ANALYSIS

¶ 27     The question before us is whether the circuit court erred in denying the Unions' motion to vacate the arbitration award on public policy grounds. In reviewing an arbitrator's award under a CBA, our supreme court "has long recognized the overriding interest in finality which inheres in the submission of disputes to arbitration, and, accordingly, has counseled against judicial review of the merits of arbitration awards." *Board of Trustees of Community College District No. 508, Cook County v. Cook County College Teachers Union, Local 1600*, 74 Ill. 2d 412, 418 (1979). Accordingly, "judicial review of an arbitrator's award is extremely limited and the award must be construed, if possible, as valid." *City of Chicago v. Fraternal Order of Police*, 2020 IL 124831, ¶ 25.

¶ 28     We have recognized—and here the Unions rely on—a narrow exception to the general rule on enforcing arbitration awards where the CBA, as interpreted, violates a well-defined and dominant public policy. *Id.* Under this limitation,

- 8 -

"if an arbitration award is derived from the essence of the collective-bargaining agreement, this court will vacate the award if it is repugnant to established norms of public policy. [Citation.] Such vacatur is rooted in the common-law doctrine that a court may refuse to enforce contracts that violate the law or public policy. [Citation.] The public-policy exception is a narrow one—one that is to be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." (Internal quotation marks omitted.) *Id.*

¶ 29    As explained by our supreme court in *City of Chicago*, quoted above, this public policy exception is rooted in the common law doctrine that allows courts to refuse to enforce any contract where the contract, as enforced, would violate law or public policy. *Id.* "The public policy must be 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *Illinois Nurses Association v. Board of Trustees of the University of Illinois*, 318 Ill. App. 3d 519, 529 (2000) (quoting *AFSCME v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996)).

¶ 30    In considering whether vacatur of an arbitration award under this public policy exception is warranted, a two-step analysis is employed: "a court first determines whether a well-defined and dominant public policy can be identified and, if so, whether the arbitrator's award, as reflected in his interpretation of the agreement, violate[s] the public policy." (Internal quotation marks omitted.) *State, Department of Central Management Services v. AFSCME*, 2016 IL 118422, ¶ 41. Our review of an arbitration award to determine if these requirements are met is *de novo*. *City of Chicago*, 2020 IL 124831, ¶ 26.

¶ 31    Cases in which a reviewing court *has* found a well-defined and dominant public policy sufficient to invalidate an arbitration award have focused on the policy as an embodiment of a

fundamental state interest (*AFSCME v. Department of Central Management Services*, 173 Ill. 2d 299, 311 (1996) (stating that "the welfare and protection of minors has always been considered one of the state's most fundamental interests")), a long-established common law principle (*Board of Trustees*, 74 Ill. 2d at 425-26 (observing that "Illinois courts have repeatedly expressed a reluctance, long-established in the maxims of the common law, to allow persons to profit from their intentionally committed wrongful acts")), or a policy that is widely held based on its incorporation in multiple state statutes (*City of Chicago*, 2020 IL 124831, ¶¶ 31-37 (finding a well-defined and dominant public policy "rooted in state law concerning the procedures for the proper retention and destruction of government records" based on both the Local Records Act (50 ILCS 205/1 *et seq.* (West 2016)) and the State Records Act (5 ILCS 160/1 *et seq.* (West 2016)))).

¶ 32    The arbitrator in this case found that implementation of the City's Vaccination Policy was an exercise of the City's contractually recognized management rights provided for in article 4(N) of the CBAs. The Unions insists that we must vacate that arbitration award because enforcing the CBA as interpreted by the arbitrator violates the following "well-defined and dominant" public policies: (1) unions have "the right to bargain about the effects of a policy prior to implementation, the right not to be subject to unilateral changes, and the right to resolve bargaining table impasses through interest arbitration"; (2) "statutory rights and bargaining subjects cannot be waived by a [CBA] through anything less than clear, unmistakable and unequivocal language providing for the waiver"; and (3) "a public employer may not prevent Peace Officers from performing services in the context of a labor dispute subject to interest arbitration under Section 14 of the [Labor Act]." For the reasons that follow, however, we conclude none of these "policies" provide a basis for vacating the arbitration award.

¶ 33    The Unions' first argument—that the award violates their right to bargain, to not be subject

to unilateral management changes, and to impasse arbitration—relies on cases in which the Labor Board found that public employers violated the Act by implementing a policy or decision without first bargaining over the policy or decision itself, or its impact and effect on union members. See, *e.g.*, *County of Cook v. Licensed Practical Nurses Ass'n of Illinois*, 284 Ill. App. 3d 145, 153 (1996) (affirming the Labor Board's finding that the county's decision to unilaterally implement a drug-testing policy without bargaining over the decision or its impact violated the Act); *AFSCME, AFL-CIO v. State Labor Relations Bd.*, 190 Ill. App. 3d 259, 264 (1989) (affirming the Board's finding that implementation of a drug-testing policy was a managerial right, but the employer was required to bargain over the policy's disciplinary effects); *Metropolitan Alliance of Police, Chapter #612, and Village of Greenwood*, 32 PERI ¶ 159 (ILRB State Panel 2016) (finding that the employer violated the Act when it implemented promotions without bargaining over their effects).

¶ 34    These cases rest on the balancing test that the Board applies to determine whether section 4 of the Act on management rights (5 ILCS 315/4 (West 2020)) or section 7 on the duty to bargain over conditions of employment (*id.* § 7) prevails relative to a certain policy, decision, or its implementation. As our supreme court has recognized, where an issue affects both inherent managerial policy and conditions of employment, the Board is directed by the Act to "balance the benefits that bargaining will have on the decision-making process with the burdens that bargaining imposes on the employer's authority." *Central City Education Association, IEA/NEA v. Illinois Education Labor Relations Board*, 149 Ill. 2d 496, 523 (1992); see also *County of Cook v. Illinois Labor Relations Board*, 2017 IL App (1st) 153015, ¶ 45 ("courts apply the test in [*Central City*], to determine whether a matter is a mandatory subject of bargaining").

¶ 35    This first "public policy" argument by the Unions is nothing more than an argument that the arbitrator's decision that the City had the right to impose the Vaccination Policy under the

management rights clause of the CBAs is contrary to various decisions of the Board applying this balancing test. Even if these decisions were controlling here, we have no authority to overturn an arbitrator's decision based on the fact that the arbitrator made a legal error. *International Ass'n of Firefighters, Local No. 27 v. City of Springfield*, 378 Ill. App. 3d 1078, 1081 (2008).

¶ 36 Neither this balancing test nor the balancing approach itself constitute a well-defined or dominant public policy. To the contrary, this balancing test is an approach taken by the Board to reconcile two provisions of the Act. The Unions' argument is nothing more than a claim that the arbitrator's decision would come out the other way if this balancing test were applied. These cases provide no support for the Unions' argument that a well-defined and dominant "public policy" requires us to overturn the arbitration award.

¶ 37 The Unions also rely on a case where we affirmed a finding by the Board that it was an unfair labor practice to terminate a CBA while the parties were engaged in impasse arbitration. *Village of North Riverside v. Illinois Labor Relations Board*, 2017 IL App (1st) 162251. We recognized in *Village of North Riverside* that, under the Act, employees who were statutorily prohibited from striking " 'would not be on equal footing with the employer were the employer to implement its final offer upon reaching impasse,' " and that "the legislature attempted to correct this imbalance by affording those employees bargaining power to approximate the right to strike" in sections 2 and 14 of the Labor Act. *Id.* ¶¶ 21-23 (quoting *State Department of Central Management Services (Department of Corrections) v. State Labor Relations Board, State Panel*, 373 Ill. App. 3d 242, 249 (2007). Thus, we agreed with the Board that, under the Act, the employer must maintain the status quo during impasse arbitration. Any right to engage in impasse arbitration hinges on there being a mandatory subject of bargaining, as existed in *Village of North Riverside*. *Id.* ¶ 19. Unlike in *Village of Riverside*, in the case before us there was a finding by the arbitrator

that implementation of the Vaccination Policy was a management right and no bargaining was required. There is simply no "public policy" or even any rule of law that requires impasse arbitration where a public employer is exercising a management right.

¶ 38    The Unions' second claimed "public policy" argument is that the arbitration award violates a well-defined and dominant public policy that "statutory rights and bargaining subjects cannot be waived by a [CBA] through anything less than clear, unmistakable and unequivocal language providing for the waiver." The Unions point to a case in which the Board found that a management rights clause did not constitute the necessary "clear and unmistakable" waiver language and this court affirmed. *Illinois Fraternal Order of Police, Lodge 7 and City of Chicago (Department of Police)*, 21 PERI ¶ 83 (ILRB Local Panel 2005), *aff'd*, *City of Chicago v. Illinois Labor Relations Board and Illinois Fraternal Order of Police, Lodge 7*, 22 PERI ¶ 82 (2006).

¶ 39    Again, however, the problem with this argument is that the Board's *definition* of what constitutes a clear and unmistakable waiver is not a well-defined or dominant public policy. This argument is, at best, a claim that the arbitrator made an incorrect legal or factual finding that there was a waiver by the Unions of the right to bargain over the Vaccination Policy. An error in law or fact by the arbitrator is not the equivalent of a violation of a well-defined and dominant public policy by that arbitrator and therefore is not a basis for overturning an arbitration award.

¶ 40    Finally, the Unions argue that the award violates the public policy that a public employer may not prevent police officers from working in the context of a labor dispute that is subject to interest arbitration. As the Unions correctly point out, under the Vaccination Policy, officers who did not comply were not paid and could be prevented from working. As the Unions also correctly point out, section 14(m) of the Act provides that security employees, peace officers, and fire fighters may not withhold service and may not be locked out during labor disputes. 5 ILCS

315/14(m) (West 2020).

¶ 41 Section 14(m) "provides special procedures for the resolution of bargaining impasses in cases in which a strike is prohibited." *Administrative Office of Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180, 194 (1995). These procedures include prohibiting a lockout during such an impasse. Implementation by the City of the Vaccination Policy is, in no sense, an illegal lock out under section 14(m). This was not a lockout in the face of a bargaining impasse. Rather, as interpreted by the arbitrator, the Vaccination Policy and its disciplinary provisions, including putting police on unpaid leave, were a lawful exercise of the City's management rights under the CBAs. The lockout prohibition in section 14(m) is simply inapplicable.

¶ 42 At bottom, the Unions are really arguing that the arbitrator misinterpreted the CBAs because the Board has ruled differently where unions have filed unfair labor practice charges before the Board in similar disputes. But this is not a proper argument for an appeal from an arbitration award. As noted above, judicial review of an arbitrator's award is very limited. *City of Chicago*, 2020 IL 124831, ¶ 25. As our supreme court has explained, interpretation of a CBA " 'is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.' " *Board of Trustees*, 74 Ill. 2d at 421 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)). We also have no business overturning this award based on an argument that the Board might rule differently as to where the line is between management rights and the union's right to bargain and what constitutes a proper waiver. Indeed, we express no opinion as to whether the Unions could succeed on unfair labor practice charges before the Board.

¶ 43                                    IV. CONCLUSION

¶ 44    Because the Unions have failed to identify any well-defined and dominant public policy that is implicated by this arbitration award, the public-policy exception does not apply. Accordingly, we affirm the circuit court's denial of the Unions' motion to vacate the arbitration award.

¶ 45    Affirmed.