2020 IL 124831

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124831)

THE CITY OF CHICAGO, Appellee, v. FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7, Appellant.

*Opinion filed June 18, 2020.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, and Michael J. Burke concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

**OPINION**

¶ 1     This appeal presents a single issue: whether a provision in a collective bargaining agreement (CBA) that, contrary to the provisions of the Local Records Act (50 ILCS 205/1 *et seq.* (West 2016)), requires the destruction of disciplinary files after a fixed period of time violates public policy. The issue arises in the context of an action brought by the Fraternal Order of Police, Chicago Lodge No. 7

(FOP), against the City of Chicago (City) for failing to destroy records of police misconduct as required under the CBA. The matter went to arbitration, where the arbitrator held that the CBA should prevail and directed the parties to come to an agreement regarding the destruction of the documents. The City sought to overturn the arbitration award in the Cook County circuit court and was successful on public policy grounds. The appellate court affirmed, and this court allowed the FOP's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2018). For the reasons that follow, we affirm the judgment of the appellate court.

¶ 2                              PRINCIPAL STATUTES INVOLVED

¶ 3        Section 4 of the Local Records Act states in relevant part:

> "(a) Except as otherwise provided in subsection (b) of this Section, all public records made or received by, or under the authority of, or coming into the custody, control or possession of any officer or agency shall not be mutilated, destroyed, transferred, removed or otherwise damaged or disposed of, in whole or in part, except as provided by law. Any person who knowingly, without lawful authority and with the intent to defraud any party, public officer, or entity, alters, destroys, defaces, removes, or conceals any public record commits a Class 4 felony." 50 ILCS 205/4(a) (West 2016).

¶ 4        Section 6 of the Local Records Act provides for the creation of a local records commission (Commission) to administer the requirements set forth in the Act. *Id.* § 6.

¶ 5        Section 7 of the Local Records Act states in relevant part:

> "Disposition rules. Except as otherwise provided by law, no public record shall be disposed of by any officer or agency unless the written approval of the appropriate Local Records Commission is first obtained.
>
> The Commission shall issue regulations which shall be binding on all such officers. Such regulations shall establish procedures for compiling and submitting to the Commission lists and schedules of public records proposed for disposal; procedures for the physical destruction or other disposition of such public records; procedures for the management and preservation of

electronically generated and maintained records; and standards for the reproduction of such public records by photography, microphotographic processes, or digitized electronic format." *Id.* § 7.

¶ 6        Section 10 of the Local Records Act states:

"§ 10. The head of each agency shall submit to the appropriate Commission, in accordance with the regulations of the Commission, lists or schedules of public records in his custody that are not needed in the transaction of current business and that do not have sufficient administrative, legal or fiscal value to warrant their further preservation. The head of each agency shall also submit lists or schedules proposing the length of time each records series warrants retention for administrative, legal or fiscal purposes after it has been received by the agency. The Commission shall determine what public records have no administrative, legal, research or historical value and should be destroyed or otherwise disposed of and shall authorize destruction or other disposal thereof. No public record shall be destroyed or otherwise disposed of by any Local Records Commission on its own initiative, nor contrary to law. This Section shall not apply to court records as governed by Section 4 of this Act." *Id.* § 10.

¶ 7                                    BACKGROUND

¶ 8        Since January 1981, the City of Chicago and the Fraternal Order of Police, Chicago Lodge No. 7, have been parties to a collective bargaining agreement. Central to this case is section 8.4 of the 2007-12 CBA, which mandates the destruction of disciplinary and investigation records like complaint register files. These files are produced in the course of investigations by the Civilian Office of Police Accountability (COPA) and the Chicago Police Department's Bureau of Internal Affairs of alleged misconduct by Chicago Police Department (CPD) officers. COPA and the bureau had the authority to recommend to the CPD superintendent disciplinary action for violations of CPD rules and regulations. The relevant terms of section 8.4 have remained substantially unchanged over the decades since it was implemented in the initial CBA. Section 8.4 of the 2007-12 CBA reads in relevant part:

- 3 -

"All disciplinary investigation files, disciplinary history card entries, Independent Police Review Authority and Internal Affairs Division disciplinary records, and any other disciplinary record or summary of such record other than records related to Police Board cases, will be destroyed five (5) years after the date of the incident or the date upon which the violation is discovered, whichever is longer ***."

¶ 9 Until 1991, the City destroyed records subject to section 8.4 in accordance with that provision. That changed in 1991 when a federal district judge entered an order in a civil rights case requiring the City to cease destroying complaint register files. Other federal district judges also began entering similar orders as a matter of routine. Thereafter, the City was unsuccessful in its multiple attempts to eliminate section 8.4 from the CBA during negotiations with the FOP. As such, the provision remains included in the CBA.

¶ 10 In 2011 and 2012, the FOP filed two grievances over the City's failure to destroy complaint register files in excess of five years old and otherwise not excepted from destruction pursuant to section 8.4 of the CBA. The City denied both of the FOP's grievances, and the FOP initiated arbitration.

¶ 11 Subsequently, in October 2014, the City notified the FOP that the City intended to comply with requests under the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2014)) from the Chicago Tribune and Chicago Sun-Times for information related to complaint register files dating back to 1967. The FOP sought a preliminary injunction in the circuit court on the basis that disclosure of the complaint register files during arbitration would interfere with the FOP's ability to obtain relief in arbitration. In December 2014, the circuit court granted the FOP's request for a preliminary injunction barring the release of the complaint register files until the FOP's claims under the CBA were adjudicated. The City and Chicago Tribune filed separate interlocutory appeals challenging the preliminary injunction. In May 2015, the circuit court entered a second preliminary injunction enjoining the City from releasing any complaint register files more than four years old[1] as of the date of the FOIA request, and the City filed an interlocutory appeal.

---

[1]Section 8 of the Personnel Record Review Act provides that an employer, before releasing personnel-related information to a third party, "shall ***, except when the release is ordered to a

¶ 12    In December 2015, the United States Department of Justice (DOJ) announced that, pursuant to the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 13701 *et seq.* (2006)), it had opened a civil pattern or practice investigation of the CPD focusing on allegations of use of excessive force and discriminatory policing. In connection with the investigation, the DOJ sent the City a document preservation request and document preservation notice requesting the City and the CPD to preserve all existing documents related to all complaints of misconduct against Chicago police officers, including documents related to the investigations into and discipline imposed because of such alleged misconduct. In a follow-up communication, the DOJ clarified that its document preservation request was intended to cover all officer misconduct complaint and disciplinary files maintained by the CPD, including those that were the subject of the two pending arbitration cases. In light of the letter, the City informed the arbitrator of the pendency of the DOJ investigation and requested guidance on how the City should respond to the DOJ's requests for the production of misconduct and disciplinary records.

¶ 13    A month later, in January 2016, the arbitrator issued his initial opinion and interim award, which found that the City violated section 8.4 of the CBA and directed the parties to meet and attempt to establish a procedure for compliance. The arbitrator remanded the matter to the parties to negotiate a timeline and method on how "to destroy all records covered by Section 8.4 [of the CBA]," except for files related to pending litigation or arbitration.

¶ 14    In February 2016, an assistant United States attorney sent letters to the City specifically stating that, "for the duration of DOJ's pattern and practice investigation," the City and CPD must "preserve all existing documents related to all complaints of misconduct," including those that were the subject of the arbitration.

¶ 15    On April 28, 2016, the arbitrator issued a second award, altering his previous interim award and denying the plaintiff's grievances "for the reasons of the public

---

party in a legal action or arbitration, delete disciplinary reports, letters of reprimand, or other records of disciplinary action which are more than 4 years old." 820 ILCS 40/8 (West 2008).

policy involved in the request of the U.S. Department of Justice, and only for this reason."

¶ 16    In response to a motion filed by the FOP requesting reconsideration or clarification of the second award, on June 21, 2016, the arbitrator issued a third and final award, incorporating the prior awards and clarifying that public policy would not prevent enforcement of the initial January 2016 award once the DOJ had completed its investigation.

¶ 17    On July 8, 2016, the appellate court in the FOP's preliminary injunction action vacated the circuit court's 2014 and 2015 orders granting the FOP's requests. *Fraternal Order of Police, Chicago Lodge No. 7 v. City of Chicago*, 2016 IL App (1st) 143884, ¶ 55. The appellate court found that, although the parties' CBA mandated destruction of complaint register files that were more than four years old, an arbitration award seeking enforcement of this provision would violate FOIA and the public policy underlying the General Assembly's enactment of the FOIA. Accordingly, the appellate court held that there was no legal basis to enjoin the City and CPD from releasing the requested records in order to allow the FOP to pursue a legally unenforceable remedy at arbitration. *Id.* ¶ 38.

¶ 18    On July 26, 2016, the City filed a petition in the circuit court to vacate the arbitration award on the grounds that it violated Illinois public policy favoring the proper retention of important public records. In August 2016, the FOP filed a counterpetition to confirm the arbitration award.

¶ 19    On January 13, 2017, while the case remained pending in the circuit court, the DOJ issued its comprehensive report. Among its many conclusions, the DOJ found that section 8.4's "document destruction provision not only may impair the investigation of older misconduct, but also deprives CPD of important discipline and personnel documentation that will assist in monitoring historical patterns of misconduct."

¶ 20    Around the same time, a local police accountability task force (Task Force) was formed to evaluate CPD's practices separately from the DOJ's investigation. The Task Force also concluded that section 8.4 is problematic and likely violates Illinois law because "[e]xpunging records contradicts best practices, impedes the development of early intervention systems and deprives the public of information

- 6 -

that is rightfully theirs." The Task Force further stated that section 8.4 "also deprives police oversight bodies of evidence of potential patterns of bad behavior" and "it may also deprive wrongfully convicted persons of exonerating information." Consequently, the Task Force recommended:

"The provision requiring destruction of records should be eliminated. The rule is in tension if not outright conflict with general principles of public record-keeping, and deprives the public of important information that is rightfully theirs and may include the destruction of information that serves numerous operational and public policy objectives."

¶ 21 In October 2017, the circuit court granted the City's petition to vacate the arbitration award and denied the FOP's counterpetition to enforce the award, ruling that enforcement of the award "violated a well-defined and dominant public policy to preserve government records." The court stated:

"To hold otherwise would (i) violate the public policy of maintaining public records for the benefit of the municipality and the general public; (ii) infringe on the municipality and general public's ownership interest in public records; (iii) usurp the municipality's right to determine for itself what records are required for the transaction of business, including legal and administrative matters; and (iv) commandeer the authority of a local records commission as the exclusive arbiter of whether and what public records may be destroyed."

¶ 22 Referencing the reports published by the DOJ, the circuit court agreed with the Task Force's findings that

"destruction of important public records, such as the police disciplinary files at issue here, undermines principles of government transparency that are so vital to the preservation of the rule of law. If the City is to be responsive to the citizenry, it must have access to historical police disciplinary and investigative records to make better-informed decisions on policing, a point echoed in the DOJ and Task Force reports."

¶ 23 The FOP appealed, and the appellate court affirmed, holding that the statutory framework the General Assembly constructed in the Local Records Act (50 ILCS 205/1 *et seq.* (West 2016)), the State Records Act (5 ILCS 160/1 *et seq.* (West

2016)), and FOIA (5 ILCS 140/1 *et seq.* (West 2016)) establishes "a well-defined public policy favoring the proper retention of important public records for access by the public." 2019 IL App (1st) 172907, ¶ 27. The appellate court explained that these acts mandate that the destruction of public records "occur only after consideration by and with the approval of the head of the governmental agency and the [Local Records] Commission and in a well-regulated process established by the Commission." *Id.* ¶ 32. The appellate court found that the arbitrator's award requiring the City to destroy all records related to alleged police misconduct without consideration of whether the records have administrative, legal, research, or historical value ignored the requirements of the Local Records Act and resulted in diminishing the Commission's authority to determine what records should be destroyed or maintained. *Id.* ¶ 36.

¶ 24                                    ANALYSIS

¶ 25      It is well established that judicial review of an arbitrator's award is extremely limited and the award must be construed, if possible, as valid. *American Federation of State, County & Municipal Employees v. State of Illinois*, 124 Ill. 2d 246, 254 (1988) (*AFSCME I*). This court, however, has recognized a public-policy exception to vacate arbitration awards that are based on collective bargaining agreements. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 306 (1996) (*AFSCME II*). Under the public-policy exception, if an arbitration award is derived from the essence of the collective-bargaining agreement, this court will vacate the award if it "is repugnant to established norms of public policy." *Id.* at 307. Such vacatur is rooted in the common-law doctrine that a court may refuse to enforce contracts that violate law or public policy. *Id.* at 306-07. The public-policy exception is a narrow one—one that is to be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy. *Id.* at 307.

¶ 26      In order to vacate an award under the exception, this court applies a two-step analysis. *Id.* The initial question is whether a well-defined and dominant public policy can be identified through a review of our constitution, statutes, and relevant judicial opinions. *Id.* (citing *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180,

193 (1910)). If we establish the existence of a well-defined and dominant public policy, we must then determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy. *Id.* at 307-08. Because our inquiry is whether the arbitrator's construction of the CBA, as reflected in his award, is unenforceable due to a predominating public policy, which is a question of law, our review is *de novo*. *Country Preferred Insurance Co. v. Whitehead*, 2012 IL 113365, ¶ 27. With these principles in mind, we turn to the issue presented.

¶ 27 Central to this case is section 8.4 of the 2007-12 CBA, which requires the destruction of "[a]ll disciplinary investigation files, disciplinary history card entries, Independent Police Review Authority and Internal Affairs Division disciplinary records, and any other disciplinary record or summary of such record other than records related to Police Board cases" after five years from the date of the incident or the date upon which the violation is discovered, whichever is longer.

¶ 28 As to the initial inquiry of our public policy exception, we must first examine whether our constitution, statutes, or judicial opinions shed light on a well-defined and dominant public policy regarding the challenged provision.

¶ 29 To support its argument that there is a "well-defined and dominant public policy," the City cites various sections of the Local Records Act, which set forth the mandatory procedures a governmental body must follow prior to the destruction of government records. The City argues that section 8.4's document destruction requirement in the CBA directly conflicts with the plain language of the Local Records Act.

¶ 30 In response, the FOP argues that there is no well-defined, dominant public policy that would allow Illinois courts to set aside a provision within a collective bargaining agreement mandating document destruction of governmental records like police disciplinary and investigation records. The FOP contends that the City's reliance on the Local Records Act as well as the State Records Act is misplaced because these legislative acts do not specifically preclude the City from entering into an independent document destruction agreement. The FOP's arguments do not withstand scrutiny.

¶ 31 The Local Records Act, which undisputedly applies to the City, directs that local public records "shall not be mutilated, destroyed, transferred, removed or

otherwise damaged or disposed of, in whole or in part, except as provided by law" and even goes so far as to make it a Class 4 felony to "knowingly, without lawful authority and with the intent to defraud any party, public officer, or entity, alter[ ], destroy[ ], deface[ ], remove[ ], or conceal[ ] any public record." 50 ILCS 205/4(a) (West 2016).

¶ 32    Section 7 requires that "no public record shall be disposed of by any officer or agency unless the written approval of the appropriate Local Records Commission is first obtained." *Id.* § 7. Section 7 further vests in the Commission the authority to issue binding regulations and procedures to "establish procedures for compiling and submitting to the Commission lists and schedules of public records proposed for disposal"; to regulate "the physical destruction or other disposition of such public records"; to manage the "preservation of electronically generated and maintained records"; and to create "standards for the reproduction of such public records by photography, microphotographic processes, or digitized electronic format." *Id.*

¶ 33    Under the requirements of section 10 of the Local Records Act, the head of each local governmental agency must submit to the Commission "lists or schedules of public records in his custody that are not needed in the transaction of current business and that do not have sufficient administrative, legal or fiscal value to warrant their further preservation" and "lists or schedules proposing the length of time each records series warrants retention for administrative, legal or fiscal purposes after it has been received by the agency." *Id.* § 10. Once a local governmental agency submits local public records for review, the Commission will decide whether the records should be maintained or destroyed after it determines "what public records have no administrative, legal, research or historical value and should be destroyed or otherwise disposed of and shall authorize destruction or other disposal thereof." *Id.*

¶ 34    In this case where the challenge to the arbitrator's award is substantiated on establishing a direct conflict between a provision of the CBA and statutory requirements, we need not look further than the plain language of the statute to determine the state's public policy. See, *e.g.*, *People v. Felella*, 131 Ill. 2d 525, 539 (1989) ("Declaring public policy is the domain of the legislature."); *Henderson v. Foster*, 59 Ill. 2d 343, 347-48 (1974) (citing various cases for the proposition that

state statute is the strongest indicator of public policy and, where the legislature speaks on a subject upon which it has constitutional power to legislate, the public policy is what the statute passed indicates); *AFSCME II*, 173 Ill. 2d at 316-17 (relying on various statutes to find a well-defined and dominant public policy).

¶ 35 In light of the plain language of the Local Records Act, we agree with the City that the statutory framework the General Assembly constructed makes clear that Illinois recognizes a public policy favoring the proper retention of government records and that the destruction of public records may occur only after consideration by and with the approval from the Commission in a process established by the Commission. 50 ILCS 205/7, 10 (West 2016). As such, the procedures laid out in the Local Records Act are an express, legislative restriction on a local government to act in any other way than authorized by the statute.

¶ 36 We find further support that Illinois public policy demands the oversight of the destruction and maintenance of government records through creation of a State Records Commission which, under the State Records Act, similarly requires state agencies to seek the approval of the State Records Commission prior to the destruction of state records. 5 ILCS 160/17 (West 2016). The legislature underscored its public policy purposes for enacting the State Records Act, specifically declaring:

> "Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be the public policy of the State of Illinois (i) that government records are a form of property whose ownership lies with the citizens and with the State of Illinois; [and] (ii) that "those records are to be created, maintained, and administered in support of the rights of those citizens and the operation of the State ***." *Id.* § 1.5.

The State Records Act further states, "those records are, with very few exemptions, to be available for the use, benefit, and information of the citizens; and *** may not be disposed of without compliance to the regulations in this Act." *Id.*

¶ 37 In sum, we find there is a "well-defined and dominant" public policy rooted in state law concerning the procedures for the proper retention and destruction of government records, which is at issue in this case. We turn then to the question of whether the arbitrator's award violated the public policy established by the

legislature by enforcing compliance with the contract provision. We conclude that it did.

¶ 38 Here, the arbitrator determined in his initial arbitration order that the City violated section 8.4 by withholding the destruction of the disciplinary records covered under the agreement. Consequently, the arbitrator directed the parties "to negotiate between themselves a time line and method to implement the findings" and that the City should "destroy all records covered by Section 8.4." Addressing the City's argument that police disciplinary records cannot be destroyed without the Commission's written approval, the arbitrator interpreted the CBA to hold that there is no basis to suggest that the issuance of an award granting relief in favor of the FOP violates public policy, stating "in issuing an Award that enforces Section 8.4 [he] is doing so consistent with State law and not contrary to State public policy." In the arbitrator's subsequent awards, which incorporate the initial award, the arbitrator again found the document destruction requirement valid and enforceable once the DOJ concluded its investigation.

¶ 39 Before this court, the FOP contends the City's facial challenge is a "direct attack on the contract language, as opposed to the enforceability of the Award, clearly indicating that the City seeks to evade its bargaining obligations through this action." The FOP notes that, because "the City agreed to the provision, *** presumably with full knowledge of its obligations under the Local Records Act," the provision must be contractually enforced. The FOP argues that the award can be validly enforced because the City can still request document destruction approval from the Commission.

¶ 40 Although the FOP is correct that the City could comply with the Local Records Act by submitting disciplinary records to the Commission, which we note is not required under the CBA, submission to the Commission is but a single element of the statutory procedures a local government must follow under the Local Records Act. The second, and arguably most crucial, aspect is compliance with the Commission's ultimate decision regarding the retention or destruction of the government records.

¶ 41 As written, section 8.4 only requires that disciplinary documents "will be destroyed" after a finite period of time. Section 8.4 does not take into consideration whether the records "do not have sufficient administrative, legal or fiscal value to

warrant their further preservation" (see 50 ILCS 205/10 (West 2016)), nor does the provision require the parties to be bound by a decision from the Commission. In fact, section 8.4 makes no reference to any of the mandatory review procedures codified in the Local Records Act.

¶ 42     Moreover, the FOP's assertion that the City could comply with state law by submitting disciplinary records to the Commission begins to quickly unravel when considering the circumstance where, after submitting disciplinary records to the Commission for review, the Commission denies the City's request for destruction, thereby mandating the retention of the disciplinary records covered under section 8.4. In this situation, the City would find itself in a catch-22, where, on the one hand, the City would violate the CBA (as well as the arbitrator's award) if, in accordance with an order from the Commission, the City retained disciplinary records beyond section 8.4's five-year requirement for destruction. On the other hand, the City would violate the Commission's binding order if it were to destroy any public records per the CBA without the Commission's "written approval" or contrary to the Commission's mandate. *Id.* § 6. Thus, even if the City complies with the initial review procedures of the Local Records Act, the FOP's position cannot be reconciled with state law, as it makes no allowance for the Commission to decide whether local government records should be destroyed or retained. Any attempt by the City to challenge the Commission's decision based on the CBA's document destruction requirement would be futile, given that the legislature has vested in the Commission the ultimate authority to determine what public records should destroyed. An opposite result would lead to a shift in the balance of power where document destruction procedures in a contract provision would supersede statutory procedures. Such an outcome runs counter to the Commission's oversight responsibility and is completely inconsistent with the plain language and the spirit of the Local Records Act. Hence, it is no surprise that, when asked at oral argument whether this apparent conflict could be reconciled, counsel for the FOP declined to provide a definitive answer but rather stated he would first need to consider the Commission's order requiring the retention of public records covered under section 8.4. As illustrated above, waiting for an order from the Commission denying the City's request for the destruction of records covered under section 8.4 is unnecessary as the provision, on its face, fails to require or provide for the City to act in accordance with the document destruction procedures expressly outlined in the Local Records Act. Without allowing the City to comply with state law, section

8.4 clearly contravenes a well-defined statutory declaration of public policy and is simply incompatible with the legislative procedures articulated in the Local Records Act.

¶ 43    While parties are generally free to make their own contracts, this court has long held that when a conflict exists between a contract provision and state law, as it clearly does in this case, state law prevails. See, *e.g.*, *Green v. Hutsonville Township High School District No. 201*, 356 Ill. 216, 221 (1934) ("A contract expressly prohibited by law is void, and there is no exception to this rule for the reason that a law cannot at the same time prohibit a contract and enforce it." (citing *Duck Island Hunting & Fishing Club v. Edward Gillen Dock, Dredge & Construction Co.*, 330 Ill. 121 (1928), and *DeKam v. City of Streator*, 316 Ill. 123 (1925))); *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 129 (2005) (where a provision in an insurance policy conflicts with the law, the statute will continue to control). This doctrine is based on the common-law notion that courts will not lend judicial power to the enforcement of private agreements that are immoral or illegal. *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987). That is the precise situation presented here where a provision in a CBA contravenes explicit state law.

¶ 44    Accordingly, based on the foregoing reasons, the arbitrator erred in finding that section 8.4 is "consistent with state law and not contrary to state public policy," thereby mandating the parties to comply with the destruction of "all discipline records" covered under that provision. Consequently, the award is void and not enforceable. See, *e.g.*, *AFSCME I,* 124 Ill. 2d at 260 ("An arbitration award in contravention of paramount considerations of public policy is not enforceable.").

¶ 45    Based on our holding above that section 8.4 of the CBA violates explicit state law, we reject the FOP's assertion that the arbitration award is enforceable per section 15 of the Illinois Public Labor Relations Act (Labor Act) (5 ILCS 315/15 (West 2016)). Section 15 provides, in relevant part, the following:

"(a) In case of any conflict between the provisions of this Act and any other law (other than Section 5 of the State Employees Group Insurance Act of 1971 and other than the changes made to the Illinois Pension Code by Public Act 96-889 and other than as provided in Section 7.5), executive order or administrative regulation relating to wages, hours and conditions of employment and

employment relations, the provisions of this Act or any collective bargaining agreement negotiated thereunder shall prevail and control. ***

(b) Except as provided in subsection (a) above, any collective bargaining contract between a public employer and a labor organization executed pursuant to this Act shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." *Id.*

¶ 46 The FOP argues that section 15 of the Labor Act establishes a public policy in favor of enforcing labor arbitration awards over any other laws. As such, the FOP argues that, if this court finds a conflict between section 8.4 of the CBA and the provisions in the Local Records Act, the CBA prevails. We disagree.

¶ 47 If section 15 of the Labor Act were read as the FOP advocates, the public-policy exception established and applied by this court in numerous decisions (see, *e.g.*, *AFSCME I*, 124 Ill. 2d 246) would cease to exist. That is so because no matter how offensive to public policy an arbitrator's decision is—even if it violates state law— the arbitrator's decision would stand. By this logic, the public policy exception doctrine would never apply to CBA provisions affecting the terms and conditions of employment, which is contrary to our decision in *AFSCME II* striking down just such a CBA provision on the ground that, "[a]s with any contract, a court will not enforce a collective-bargaining agreement that is repugnant to established norms of public policy." *AFSCME II*, 173 Ill. 2d at 307, 316.

¶ 48 Further, we reject the FOP suggestion that this court should consider legislative bills that were introduced but never signed into law as evidence of legislative intent. The FOP contends that, because the General Assembly failed to pass proposed bills that would have required retention of records of alleged police misconduct and employee discipline, "the Legislature has signaled that such a public policy mandating indefinite retention of these types of records should not be established."

¶ 49 The FOP's position totally disregards the basic framework of the Illinois Constitution where the only manner in which the General Assembly has the power to impose its will upon the state is through the passage of a bill in both chambers that is either signed by the governor or repassed by a supermajority after his veto. Ill. Const., art. IV, §§ 8, 9. Accordingly, the introduction of a bill that is never

passed or signed into law has no legal effect whatsoever, as the legislature cannot express its will or intent by a *failure* to legislate. See *United States v. Estate of Romani*, 523 U.S. 517, 535 (1998) (Scalia, J., concurring in part and concurring in the judgment) ("The act of refusing to enact a law (if that can be called an act) has utterly no legal effect, and thus has utterly no place in a serious discussion of the law."). The reasoning is simple: there are several equally tenable inferences that may be drawn from such inaction. See, *e.g.*, *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 170 (2001) (stating that failure to pass a bill outlawing an agency interpretation of the law does not imply Congress's "acquiescence" to that interpretation, in part because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others"). One could only envision the chaos that would ensue (especially for the judiciary) if any of the 177 members of the General Assembly could dictate public policy through the introduction of a legislative bill—regardless if the bill becomes law.

¶ 50        With all this being said, our decision does not disregard the right of the parties to negotiate their contracts, nor do we attempt to restrain them in any way from doing so in the future. *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 55 (2011). We have reasoned:

> "The freedom of parties to make their own agreements, on the one hand, and their obligation to honor statutory requirements, on the other, may sometimes conflict. These values, however, are not antithetical. Both serve the interests of the public. Just as public policy demands adherence to statutory requirements, it is in the public's interest that persons not be unnecessarily restricted in their freedom to make their own contracts." *Progressive Universal Insurance Co.*, 215 Ill. 2d at 129.

However, "[a]s with any contract, a court may not enforce a collective-bargaining agreement in a manner that is contrary to public policy." *AFSCME II*, 173 Ill. 2d at 318; *DeKam*, 316 Ill. at 129 ("A contract expressly prohibited by a valid statute is void. This proposition has no exception, for the law can not at the same time prohibit a contract and enforce it. The prohibition of the legislature cannot be disregarded by the courts.").

¶ 51                                      CONCLUSION

¶ 52        For the foregoing reasons, we find that the arbitration award violated an explicit, well-defined, and dominant public policy. The appellate court was therefore correct when it affirmed the judgment of the circuit court vacating that award. Accordingly, the judgment of the appellate court is affirmed.

¶ 53        Affirmed.

¶ 54        JUSTICE KILBRIDE, dissenting:

¶ 55        I respectfully dissent from the majority. My disagreement with the majority has nothing to do with the records that are the subject of this appeal. I firmly believe that police misconduct must be rooted out, and I would vehemently oppose the indiscriminate destruction of police misconduct records. That is not what the arbitrator ordered in this case.

¶ 56        Rather, the arbitrator's award merely directed the parties to meet and negotiate. The arbitrator *did not* order the destruction of any records. We do not know what agreement, if any, would have resulted from the parties meeting and negotiating. We do not know whether those negotiations would have resulted in an agreement for the future destruction of any records. We also do not know whether they would have resulted in an agreement that fully complied with the Local Records Act (50 ILCS 205/1 *et seq.* (West 2016)) and all other applicable laws. I believe the parties should be allowed to meet and negotiate in accordance with the arbitrator's directive. This court could retain jurisdiction and remand for negotiations. After proceeding with negotiations, it would be warranted for this court to review the status of any agreement.

¶ 57        To repeat, the issue of police misconduct is a serious issue that must be confronted by society. This court was asked, however, to consider a fundamental principle of labor law, namely, the validity and enforcement of arbitration awards. The majority acknowledges that "[i]t is well established that judicial review of an

arbitrator's award is extremely limited and *the award must be construed, if possible, as valid*." (Emphasis added.) *Supra* ¶ 25 (citing *American Federation of State, County & Municipal Employees v. State of Illinois*, 124 Ill. 2d 246, 254 (1988) (*AFSCME I*)). I agree with the majority that there is a " 'well-defined and dominant' public policy rooted in state law concerning the procedures for the proper retention and destruction of government records" (*supra* ¶ 37) and that an arbitrator's award violating this public policy can be set aside (*supra* ¶ 25).

¶ 58     There is, however, a separate "well-defined and dominant" public policy in state law to enforce collective-bargaining agreements and labor arbitration awards. See 5 ILCS 315/15 (West 2016). I believe that these two important public policies can coexist harmoniously, and the arbitrator's decision may be construed so as not to create a conflict between these public policies. I disagree with the majority's conclusion that "the arbitrator's award [in this case] violated the public policy established by the legislature by enforcing compliance with the contract provision." *Supra* ¶ 37. Unfortunately, today's decision may well adversely impact the enforceability of other labor agreements.

¶ 59     As the majority recognizes, in January 2016, the arbitrator issued his initial opinion and interim award directing the parties to meet and attempt to establish a procedure for compliance with section 8.4 of the collective bargaining agreement and to negotiate a timeline and procedure to be followed in destroying eligible records and a method on how to destroy all records covered by that provision, except for records related to pending litigation or arbitration. *Supra* ¶ 13. On April 28, 2016, the arbitrator issued a second award altering his previous interim award " 'for the reasons of the public policy involved in the request of the U.S. Department of Justice.' " *Supra* ¶ 15. On June 21, 2016, the arbitrator issued a third award clarifying that public policy would not prevent enforcement of the initial January 2016 award once the Department of Justice completed its investigation. *Supra* ¶ 16.

¶ 60     The arbitrator's award simply directed the parties to negotiate the method and procedure for the possible future destruction of eligible records in compliance with section 8.4 of the collective bargaining agreement. The arbitrator *did not* mandate destruction of all records. Indeed, after negotiations, the parties may not reach any agreement on the destruction of any records. Accordingly, I would find that the

arbitrator's award did not violate any "well-defined and dominant" public policy concerning the procedures for the proper retention and destruction of government records.

¶ 61　　There is strong United States Supreme Court labor law precedent confirming a court's duty to uphold arbitration awards. Importantly, as the Supreme Court made clear in *United Paperworkers International v. Misco, Inc.*, 484 U.S. 29, 37 (1987):

> "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government ***. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute."

¶ 62　　The Supreme Court in *Misco* emphasized:

> "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. *** [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38.

¶ 63　　*Misco* likewise recognized that "a court may refuse to enforce contracts that violate law or public policy." *Misco*, 484 U.S. at 42 (citing *W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum, & Plastic Workers of America*, 461 U.S. 757, 766 (1983), and *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)). The Supreme Court cautioned, however,

> "that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be

ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " (Emphasis in original.) *Misco*, 484 U.S. at 43 (quoting *W.R. Grace*, 461 U.S. at 766, quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

¶ 64    In examining its prior decision in *W.R. Grace*, the Supreme Court in *Misco* stated:

"Two points follow from our decision in *W. R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other 'laws and legal precedents' rather than an assessment of 'general considerations of supposed public interests.' [*W.R. Grace*,] 461 U. S., at 766. *At the very least, an alleged public policy must be properly framed under the approach set out in* W. R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced.*" (Emphasis added.) *Misco*, 484 U.S. at 43.

¶ 65    This court subsequently adopted in *AFSCME I*, 124 Ill. 2d 246, the analysis employed by the Supreme Court in *W.R. Grace* and *Misco*. In *AFSCME I*, a patient at a mental health facility died while two employees of the facility were away from their worksite without permission. The Department of Mental Health discharged the employees, but the arbitrator reduced the discipline to suspensions and reinstatement without back pay or other benefits. *AFSCME I*, 124 Ill. 2d at 250-51.

¶ 66    This court, while recognizing we are not bound to follow federal decisions because Illinois has a different arbitration act, looked to the Supreme Court's decisions in *W.R. Grace* and *Misco*, reaffirming that the public policy exception is extremely narrow. *AFSCME I*, 124 Ill. 2d at 260-61. *In AFSCME I*, this court acknowledged "the important public policy of this State's commitment to compassionate care for the mentally disabled," but we also recognized that the case involved "the public policy of promoting constructive relationships between public employers and public employees, and the public policy which requires finality in arbitration awards." *AFSCME I*, 124 Ill. 2d at 262. We determined that the

collective-bargaining agreement, as interpreted by the arbitrator, did not violate any explicit public policy that was well defined and dominant. *AFSCME I*, 124 Ill. 2d at 262-63. Moreover, we noted that the arbitration award in *AFSCME I* did not sanction violations of the law. *AFSCME I*, 124 Ill. 2d at 263. Accordingly, we held that public policy did not mandate discharge of the employees. *AFSCME I*, 124 Ill. 2d at 265.

¶ 67 Subsequently, in *American Federation of State, County and Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996) (*AFSCME II*), this court applied the principles articulated in *AFSCME I*, *W.R. Grace*, and *Misco*. In *AFSCME II*, we held that an arbitration award reinstating an employee who falsely stated she had seen three children in the Department of Children and Family Services' custody and that they were "doing fine," when in fact they had perished in an accidental fire, violated public policy in favor of truthful and accurate reporting by the Department of Children and Family Services. *AFSCME II*, 173 Ill. 2d at 307-08.

¶ 68 *AFSCME II* specifically recognized that the public policy exception's ultimate applicability to vacate an arbitrator's award in any case is necessarily fact dependent. *AFSCME II*, 173 Ill. 2d at 311. This court emphasized that the public policy concerning "the welfare and protection of minors has always been considered one of the State's most fundamental interests." *AFSCME II*, 173 Ill. 2d at 311. Indeed, we also stated that "a mechanical application of [a collective-bargaining agreement] provision may *** collide with public policy" and recognized "the possibility of other remedies, short of a blanket reinstatement." *AFSCME II*, 173 Ill. 2d at 334. Thus, this court determined that the arbitrator's award ran afoul of public policy promoting the welfare and protection of abused and neglected children. *AFSCME II*, 173 Ill. 2d at 318-20. A careful reading of *AFSCME II* shows it left the door open for the arbitrator to enter an award that would not violate public policy. See *AFSCME II*, 173 Ill. 2d at 332-33.

¶ 69 Here, no public harm results from the arbitrator's decision directing the parties to negotiate over the method and procedure for destroying eligible records. The arbitrator did not engage in a "mechanical application" of any collective bargaining agreement provision and specifically acknowledged public policy concerns when declining to impose a blanket direction to destroy records. Instead, the arbitrator

simply directed the parties to negotiate the matter. How could continued negotiations violate any public policy?

¶ 70    The arbitration award is specifically enforceable under section 15 of the Illinois Public Labor Relations Act (5 ILCS 315/15 (West 2016)). There is a well-established dominant public policy supporting collective bargaining and the enforcement of labor arbitration awards. The Public Labor Relations Act sets forth this explicit public policy:

> "It is the public policy of the State of Illinois to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours and other conditions of employment or other mutual aid or protection." 5 ILCS 315/2 (West 2016).

¶ 71    The Public Labor Relations Act specifically provides that it and any agreements made under the Act "*shall prevail and control*" when there is "any conflict between the provisions of this Act and any other law." (Emphasis added.) 5 ILCS 315/15(a) (West 2016). The Public Labor Relations Act further states that "any collective bargaining contract between a public employer and a labor organization *** *shall supersede* any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." (Emphasis added.) 5 ILCS 315/15(b) (West 2016). Thus, section 15 of the Public Labor Relations Act clearly establishes a well-defined and dominant public policy favoring collective bargaining and the enforcement of labor arbitration awards.

¶ 72    This court emphasized in *AFSCME I* both "the public policy of promoting constructive relationships between public employers and public employees, and the public policy which requires finality in arbitration awards." *AFSCME I*, 124 Ill. 2d at 262. Likewise, in *City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268*, 122 Ill. 2d 353, 363-64 (1988), this court discussed the Public Labor Relations Act, noting that other "courts facing conflicts between public employee bargaining laws and local civil service systems have opted in favor of granting primacy to the bargaining laws. [Citations.]"

¶ 73    Even the majority recognizes that review of an arbitrator's award is very limited, and indeed, this court must construe an award as valid if at all possible. *Supra* ¶ 25 (citing *AFSCME I*, 124 Ill. 2d at 254). Such a deferential judicial review is necessary to promote the State's declared public policy that, "where the right of employees to strike is prohibited by law, it is necessary to afford an alternate, expeditious, equitable and effective procedure for the resolution of labor disputes." 5 ILCS 315/2 (West 2016). As noted, this court has previously followed the United States Supreme Court decisions limiting the public policy exception to enforcement of arbitration awards.

¶ 74    Collective bargaining and the enforcement of arbitration awards are the cornerstone of labor policy. The majority's opinion discounts the basic protections guaranteed to public employees by the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2016)). The General Assembly, in enacting the Public Labor Relations Act evinced a strong public policy favoring collective bargaining and enforcement of labor arbitration awards over other laws.

¶ 75    The parties in this case not only collectively bargained section 8.4 but also agreed to the arbitration process for resolving any contractual disputes over the interpretation or application of section 8.4. The majority decision strikes at the heart of the collective bargaining process protected by the Public Labor Relations Act and may, as a consequence, adversely affect public sector collective bargaining contracts that contain arbitration agreements.

¶ 76    Importantly, the Public Labor Relations Act also requires that collective bargaining agreements in the public sector include a grievance procedure and, as a *quid pro quo* for the guarantee of the statutorily required final and binding arbitration process, must contain a no-strike provision for the duration of the agreement. 5 ILCS 315/8 (West 2016). In other words, in furtherance of the General Assembly's stated public policy supporting collective bargaining and final and binding arbitration procedure, public sector employees give up their right to strike.

¶ 77    Here, we have two well-defined and dominant public policies. I believe the General Assembly's clear statement of public policy favoring collective bargaining agreements and enforcement of labor arbitration awards over other laws tips the scale in this case in favor of enforcing the arbitrator's award. Nevertheless, I believe these two public policies can coexist harmoniously and, in this case, the arbitrator's

decision should be construed so as not to create a conflict between these public policies. I would hold that the arbitrator's decision requiring negotiation for the methodology and procedure for the possible future destruction of eligible records does not violate any public policy as defined by the majority.

¶ 78    Undeniably, as the majority notes, in 1991, a federal district judge entered an order in a civil rights case requiring the City of Chicago (City) to cease destroying complaint register files, and other federal district judges began entering similar orders. *Supra* ¶ 9. In January 2019, a consent decree was entered in the United States District Court for the Northern District of Illinois. The consent decree requires implementation of reforms to the Chicago Police Department and other City agencies to ensure the City and the Chicago Police Department engage in lawful, constitutional policing. The consent decree specifically states that it was not intended to alter, impair, or conflict with the collective bargaining agreements or rights of employees under the Public Labor Relations Act. The City has not argued, however, that the consent decree prohibits destruction of all disciplinary records. In any event, the arbitrator specifically excluded from negotiations the destruction of any records relating to pending litigation or arbitration.

¶ 79    Additionally, nothing in the Local Records Act requires the indefinite retention or permanent preservation of records. I would, therefore, find that the arbitrator's decision does not clearly show a violation of any public policy and should not be set aside. The arbitrator's award merely directs the parties to meet and negotiate. The award does not require the destruction of any police misconduct records or any other police disciplinary records, nor does it require the parties to violate any statute.

¶ 80    Finally, I wish to reiterate that I do not advocate the indiscriminate destruction of police misconduct records. Nor do I minimize the seriousness of police misconduct. Public safety and effective law enforcement are of utmost importance. In fact, the consent decree requires implementation of reforms to ensure the City and the Chicago Police Department engage in lawful, constitutional policing. Those reforms include identifying and analyzing trends within misconduct complaints. The parties could well negotiate the timeline and preservation of records necessary for the implementation of reforms.

¶ 81   Based on the parties' briefs and comments during oral argument, it is readily apparent that the parties are fully aware of the requirements of the Local Records Act, other applicable statutes, and the consent decree. Thus, we can safely assume that negotiations for the possible future destruction of any eligible discipline records would be done in full compliance with the consent decree and any other requirements under the law. I believe the parties should be allowed to meet and negotiate in accordance with the arbitrator's directive.

¶ 82   In sum, as I have explained, the arbitrator in this case did not mechanically apply the provisions of the collective bargaining agreement. Instead, the arbitrator thoughtfully included public policy considerations in the decision and merely directed the parties to meet and negotiate. The arbitrator *did not* order the destruction of any police misconduct records or any other police disciplinary records.

¶ 83   For those reasons, I would reverse the decision of the appellate court and enforce the arbitrator's award. Accordingly, I respectfully dissent.